**GEORGE WASHINGTON UNIVERSITY,**
Appellant,

v.

**Juanita J. SCOTT, Appellee.**

**No. 96–CV–1178.**

District of Columbia Court of Appeals.

Argued Feb. 11, 1998.
Decided May 21, 1998.

Alfred F. Belcuore, with whom Joseph Montedonico and Patricia M. Tazzara, Washington, DC, were on the brief, for the appellant.

Paul M. Higgins, Rockville, MD, with whom Patrick M. Regan, Washington, DC, was on the brief, for the appellee.

Before FARRELL, KING, and RUIZ, Associate Judges.

KING, Associate Judge:

Appellants George Washington University and George Washington University Health Plan ("GWU") appeal rulings by the trial court denying their Motion to Dismiss the Complaint, or in the Alternative for Summary Judgment, and their Motion to Reconsider and Vacate, Alter, or Amend. GWU argues that a binding arbitration clause contained in a health plan contract bars the trial sought by appellees Juanita S. Scott and Houston E. Ashlock, Jr. ("the Scotts" or "the insureds"), on claims of medical malpractice in the death of their son. For the reasons stated below, we affirm the rulings of the trial court.

I.

The Scotts were employees of the federal government during the relevant times, and as such had access to the Federal Employees Health Benefits Program administered by the Office of Personnel Management ("OPM"). Through this program, they were members of the GWU Health Plan in 1994, a health maintenance organization or "prepaid comprehensive medical plan" providing health care and insurance to its members. Membership in the plan is automatically renewed each year, unless the member opts out pursuant to instructions promulgated by OPM, which also provide: "If you decide NOT to change your enrollment, you do not need to fill out a form. Your enrollment will be continued automatically...." The Scotts allowed their policy with GWU to renew in this manner for January 1995. Any changes in the conditions and coverage of the plan, and in the premium rates paid by the member, took effect on January 1, 1995.

On December 19, 1994, the Scotts' seven-year-old son, who was suffering from a fever and other symptoms, was taken to GWU Pediatrics Center for treatment. After examination and testing, he was sent home with treatment instructions.[1] The boy's condition worsened, however, and, after his parents took him to Children's National Medical Center, he died on the morning of December 20,

---

1. These instructions included the administration of Tylenol, ibuprofen, and sponge baths.

1994. One year later, the Scotts filed the instant wrongful death and survival civil action against GWU, alleging medical malpractice by the GWU treatment staff.[2]

GWU filed its motion to dismiss or for summary judgment on February 5, 1996, arguing that a valid binding arbitration clause, which was part of the health plan agreement covering the Scotts, deprived the court of jurisdiction over this dispute. The clause mandating binding arbitration was added to the agreement effective January 1, 1995, and read in its entirety:

> Any claim for damages for personal injury, mental disturbance or wrongful death arising out of the rendition or failure to render services under this contract must be submitted to binding arbitration.

This clause appeared twice in the twenty-four pages of the 1995 agreement, once under the heading "General Limitations" and once under the heading "How the George Washington University Health Plan Changes January 1995." The 1995 agreement with the arbitration clause was distributed to plan members in November 1994. It is uncontested that the 1994 health plan agreement contained no arbitration provision relating to claims such as this one.

The trial court denied GWU's motion to dismiss or for summary judgment on June 3, 1996. In its order, the court stated that "it is uncontroverted that the purported binding arbitration provision at issue did not become effective until January 1, 1995," and that "there is no indication in the 1995 [health plan] contract that the purported binding arbitration provision should be construed to apply retroactively to medical treatment rendered prior to January 1, 1995." The trial court also ruled that "the language in the arbitration clause refers to claims arising out of 'this contract' which the Court interprets to mean the 1995 [health plan contract]." The court denied GWU's timely motion for reconsideration, filed pursuant to Super. Ct. Civ. R. 59(e), on June 20, 1996, and this appeal followed.[3]

## II.

▮ GWU contends that the long-standing "presumption in favor of arbitration" requires the court to order arbitration in this case. A long line of cases in this jurisdiction favors this presumption when there is an ambiguity in "the interpretation or construction of an agreement containing an arbitration clause." *Masurovsky v. Green,* 687 A.2d 198, 200 (D.C.1996). The rule in this jurisdiction is that "[w]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless ... the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 201–02 (citing *Carter v. Cathedral Ave. Coop., Inc.,* 566 A.2d 716, 717 (D.C.1989)).

GWU also argues that the trial court misconstrued the nature of the health plan agreement. In its order, the trial court found that there were two separate contracts, one providing coverage for 1994 and one providing coverage for 1995. In the trial court's view only the latter agreement, taking effect on January 1, 1995, included a valid arbitration clause which, the court ruled, could not be applied "retroactively" to claims arising from events taking place in 1994 under the 1994 agreement, even if the action was not brought until 1995. In response, GWU argues that the 1994 and 1995 health plan agreements are not "successive, multiple contracts," but rather a single contract subject to subsequent modifications. As there is no controlling precedent in the District of Columbia, GWU cites Maryland case law to the effect that "the renewal of an insurance policy is not a new contract, but an extension of the policy's life when made pursuant to a policy provision concerning renewal." *Benner v. Nationwide Mut. Ins. Co.,* 93 F.3d 1228, 1238 (4th Cir.1996) (citing Maryland law); *see also World Ins. Co. v. Perry,* 210 Md. 449, 124 A.2d 259, 262 (1956). GWU

---

2. According to GWU, doctors providing care to members of the plan are employees of George Washington University, under contract to the George Washington University Health Plan.

3. The trial court's denial of summary judgment is essentially "an order denying an application to compel arbitration," and therefore is appealable under D.C.Code § 16–4317(a) (1997 Repl.).

asserts that, as a modification of the Scotts' contract with the health plan, the arbitration clause is valid and binding. Therefore, GWU argues that because the claim was made, *i.e.*, this action was filed, after January 1, 1995, the arbitration provision governs.[4]

On the other hand, the insureds argue that the 1995 health plan agreement is a completely integrated document, a "new and separate contract" that replaced the 1994 agreement. As the "rendition of services" by the GWU treatment staff was in December 1994, before the 1995 agreement containing the arbitration clause took effect, the insureds contend that their claim arose under that contract and arbitration is not required. The insureds also rely upon Maryland authority, arguing that "[u]nder Maryland law, the renewal of an insurance policy is a new contract." *Bahn v. Chicago Motor Club Ins. Co.*, 98 Md.App. 559, 634 A.2d 63, 67 (1993) (citation omitted). Moreover, "as a matter of fairness and of assuring mutual assent to what is, in reality, a new contract, the law requires that reasonable notice be given to the insured if the insurer intends to make a significant change in the new policy."

*J.A.M. Assocs. v. Western World Ins. Co.*, 95 Md.App. 695, 622 A.2d 818, 822 (1993). The Scotts averred in affidavits filed in response to GWU's motion, which were not controverted, that they had no notice of the arbitration clause beyond receiving a copy of 1995 plan, and that this clause represented a significant change in the policy. Therefore, appellees assert, a new contract had been formed and the presumption in favor of arbitration should not operate in this instance.

### III.

We note at the outset that courts have widely differing views on the question whether, as a general rule, an insurance contract is a new and separate contract upon each renewal, or a single contract subject to subsequent modifications.[5] *See generally* COUCH ON INSURANCE 3d §§ 29:33–38 (3d ed.1995). We need not decide here whether insurance contract renewals are, or are not, in the ordinary course new and separate contracts. Rather, we conclude that under the circumstances presented the arbitration provision did not apply to claims, such as the one made

---

**4.** GWU concedes that if the civil action had been filed before January 1, 1995, the arbitration provision would not apply.

**5.** We ordinarily turn to the common law of Maryland for guidance when there is no District of Columbia precedent on an issue. *Napoleon v. Heard*, 455 A.2d 901, 903 (D.C.1983). However, Maryland law is unclear on this issue. *Compare World Ins. Co., supra*, 124 A.2d at 262 ("It is accepted as a general rule that a renewal of an insurance policy ... is not a new contract but an extension of the old"); *Benner, supra*, 93 F.3d at 1236 ("Maryland recognizes that a continuing insurance policy may properly be deemed a renewal, even if it contains terms different from the original policy.") (court interpreting Maryland law); *and Standard Accident & Life Ins. Co. v. Wood*, 116 Md. 575, 82 A. 702, 708 (1911), *with Reserve Ins. Co. v. Duckett*, 249 Md. 108, 238 A.2d 536, 542 (1968) (" 'The renewal of a policy is a new contract of insurance as regards the requirements of mutual assent and new consideration.' ") (quoting 13 APPLEMAN, INSURANCE LAW AND PRACTICE § 7641 (1952)); *Bahn, supra*, 634 A.2d at 67; and *J.A.M. Assocs., supra*, 622 A.2d at 822.

A brief survey of other jurisdictions reveals a similar divergence of opinion. A number of states and federal circuits treat each renewal as a continuation of the original contract, subject to subsequent modifications. *See, e.g., State Farm Gen. Ins. Co. v. Chambers*, 260 Ark. 637, 543

S.W.2d 470 (1976); *Bollenback v. Continental Cas. Co.*, 243 Or. 498, 414 P.2d 802 (1966); *Williams v. Mutual of Omaha*, 297 F.2d 876 (4th Cir.1962). Other states and federal circuits see each renewal as a new and separate contract. *See, e.g., Massachusetts Bonding & Ins. Co. v. Board of County Comm'rs*, 100 Colo. 398, 68 P.2d 555 (1937); *Schock v. Penn Tp. Mut. Fire Ins. Ass'n*, 148 Pa.Super. 77, 24 A.2d 741 (1942); *Boone v. Standard Accident Ins. Co.*, 192 Va. 672, 66 S.E.2d 530 (1951); *Tebb v. Continental Cas. Co.*, 71 Wash.2d 710, 430 P.2d 597 (1967); *Government Employees Ins. Co. v. United States*, 400 F.2d 172 (10th Cir.1968); *Hercules Bumpers, Inc. v. First State Ins. Co.*, 863 F.2d 839 (11th Cir. 1989).

Still other jurisdictions mirror Maryland's split of authority. *Compare Inter-Ocean Ins. Co. v. Banks*, 268 Ala. 25, 104 So.2d 836 (1958) *with City Mortgage & Discount v. Palatine Ins. Co.*, 226 Ala. 179, 145 So. 490 (1933); *New York Life Ins. Co. v. Buchberg*, 249 Mich. 317, 228 N.W. 770 (1930) *with Perkins v. Century Ins. Co.*, 303 Mich. 679, 7 N.W.2d 106 (1942); *Collis v. Massachusetts Bonding & Ins. Co.*, 236 A.D. 525, 260 N.Y.S. 241 (N.Y.App.Div.1932) *with Jacobson v. Equitable Life Assurance Soc'y*, 266 A.D. 510, 42 N.Y.S.2d 696 (N.Y.App.Div.1943); and *Surety Indem. Co. v. Estes*, 243 S.C. 593, 135 S.E.2d 226 (1964) *with Hodge v. National Fidelity Ins. Co.*, 221 S.C. 33, 68 S.E.2d 636 (1952).

by the Scotts, with respect to treatment provided before the effective date of the 1995 contract that included that provision.

We begin our analysis by rejecting GWU's reliance on *Masurovsky*, and the presumption of arbitrability. In that case we said that

> [t]he presumption in favor of arbitration attaches only after the trial court has determined that a valid agreement to arbitrate exists. Put another way, "the scales tip in favor of arbitration when we construe an arbitration clause, but only after we find, as an initial matter, that an enforceable arbitration clause exists."

*Masurovsky, supra,* 687 A.2d at 205 (quoting *Adamovic v. METME Corp.,* 961 F.2d 652, 654 (7th Cir.1992)). Thus, the presumption applies only to the interpretation or construction of an agreement containing an arbitration clause, not to the preliminary determination of the existence and validity of an agreement to arbitrate. *Id.* at 200. Here, the trial court determined that the arbitration clause, while valid, came into existence only with respect to claims arising from treatment under the 1995 agreement. As to claims arising from treatment during 1994, in other words, no "enforceable arbitration clause exist[ed]." *Id.* We agree.

We find support for this view in the fact that the arbitration clause was identified in the renewal material as one of the "changes" in the 1995 health plan—clearly implying that the arbitration clause was new in 1995 and did not apply to treatment provided under the 1994 plan. Nor did any bargaining accompany the making of the 1995 agreement. As previously noted, annual renewal of membership in the health plan was automatic. The arbitration clause was not the product of any negotiation between GWU and the insureds, and it is clear that the Scotts did not affirmatively agree to give up their right to seek relief in court for negligent acts committed before the effective date of the arbitration clause, i.e., January 1, 1995.

At the very least, before the arbitration clause could have any retroactive effect on rights that have already arisen and before the insureds could be held to have foregone rights previously accrued, the language of the new provision in the contract should so state. Courts "are not inclined to find that a party has waived its right to ordinary judicial process without an express and specific agreement." *Case Int'l Co. v. T.L. James & Co.,* 907 F.2d 65, 67 (8th Cir.1990). As the trial court observed, the arbitration clause itself contained no indication whatsoever that its terms would apply to treatment rendered before January 1, 1995. No ordinary reader of the 1994 and 1995 agreements would reasonably conclude that the Scotts knowingly and affirmatively gave up their right to file a civil action for negligent acts that occurred in 1994.[6] *See District of Columbia v. C.J. Langenfelder & Son, Inc.,* 558 A.2d 1155, 1164 (D.C.1989) (ambiguities in a contract "will be construed strongly against the drafter") (citations omitted).

Under the circumstances of this case the arbitration clause was a major change in the conditions of the agreement, one that radically altered the manner in which a negligence action was to be resolved. The practical effect of the addition of the arbitration clause was to create a new and separate agreement, one beginning in 1995. The arbitration clause concerns "[a]ny claims for damages ... under this contract." We agree with the trial court that "this contract" means the 1995 agreement, and that claims arising under the 1995 agreement, i.e. after January 1, 1995, will be submitted to binding arbitration. The claims of the Scotts against GWU did not arise under the 1995 agreement, however, and therefore are not so bound. Accordingly, the order of the trial court denying appellant's motion for summary judgment is

*Affirmed.*

---

6. The arbitration clause was not the only significant change made in the 1995 agreement. Twenty-one items are listed under "How the George Washington University Health Plan Changes January 1995." These include the addition and deletion of health conditions and treatments covered by the plan, increases in copayment requirements for various procedures and prescription drugs, and changes in how the plan member may obtain treatment.